IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff-Respondent,<br><br>    v.<br><br>ERIN V. MAZZEI,          (02)<br><br>            Defendant-Petitioner. | CR. NO. 22-00045 JMS-02<br>(CIV. NO. 26-00026 JMS-KJM)<br><br>ORDER (1) DENYING MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY, ECF NO. 124; AND (2) DENYING CERTIFICATE OF APPEALABILTY |

**ORDER (1) DENYING MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY, ECF NO. 124; AND (2) DENYING CERTIFICATE OF APPEALABILITY**

## I.  INTRODUCTION

Before the court is pro se Defendant-Petitioner Erin V. Mazzei's ("Defendant") Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody ("§ 2255 Motion").  ECF No. 124.[1]  For the reasons discussed below, the court DENIES the § 2255 Motion and DENIES a Certificate of Appealability.

---

[1]  All ECF citations in this Order are to the docket in the underlying criminal case, Cr. No. 22-00045 JMS.

## II.  BACKGROUND

### A.     Factual Background and Prior Proceedings

This background section sets forth only the facts necessary to understand the general history of this case and place the § 2255 Motion into proper context.  As necessary, the court will address more specific facts as they relate to particular claims raised in the § 2255 Motion.

Defendant and her husband, Christopher Mazzei, were charged in a May 26, 2022 Indictment with: (1) conspiracy to commit wire fraud in violation of 18 U.S.C § 1349 (count 1); (2) wire fraud in violation of 18 U.S.C. § 1343 (count 2); (3) conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) (count 3); and (4) money laundering in violation of 18 U.S.C. § 1957 (count 4). ECF No. 1.

On August 28, 2024, Defendant entered a plea of guilty, pursuant to a plea agreement, to counts 1 and 3 of the Indictment.  ECF Nos. 77, 79.  In return for entering a plea of guilty, the United States agreed to dismiss counts 2 and 4 after sentencing and not to file additional charges against Defendant relating to: (1) the submission of false statements to several mortgage lenders; and (2) identity theft.  ECF No. 79 at PageID.296–297.  Defendant was sentenced on January 9, 2025, to a total term of incarceration of 27 months, a term of supervised release of three years, and restitution in the amount of $1,418,174.70 (less amounts

previously paid).  *See* ECF Nos. 106, 112.  In addition, the court ordered forfeiture of real property located in Kapolei, Hawaii, real property located in Arroyo Grande, California, and over $625,000 in United States currency.  ECF No. 105 (forfeiture order).

Defendant's plea agreement contains a waiver of her right "to challenge her conviction or sentence or the manner in which it was determined in any collateral attack, including, but not limited to, a motion brought under Title 28, United States Code, Section 2255."  ECF No. 79 at PageID.312.  This waiver contains two exceptions: (1) if the court imposed a sentence above the guideline range as determined by the court, then Defendant retained the right to collaterally attack "the portion of her sentence greater than specified in that guideline range"; and (2) a claim based on ineffective assistance of counsel.  *Id.*[2]  Defendant signed the plea agreement under the heading "AGREED."  *Id.* at PageID.325.  And during her August 28, 2024 change of plea hearing, Defendant confirmed that she read the plea agreement, discussed it with counsel, and understood its terms.  ECF No. 114 at PageID.1038–1039.

---

[2]  Defendant's 27-month sentence fell within the guideline range as determined by the court.  With a guideline offense level 17 and criminal history category I, the advisory guideline range was 24 to 30 months.  *See* ECF No. 110 at PageID.996 and ECF No. 115 at PageID.1100–1101.

Defendant has been represented by several counsel throughout this proceeding.  First, Federal Public Defender Salina Kanai represented Defendant both pre- and post-indictment.  She was appointed to represent Defendant on July 26, 2021.  *See* ECF No. 4 in Misc. No. 21-00299 LEK-KJM.  On August 24, 2022, after Kanai's motion to withdraw was granted,[3] Criminal Justice Act ("CJA") attorney John Schum was appointed to represent Defendant.  *See* ECF Nos. 15, 19, 20.  On February 8, 2023, CJA counsel Matthew Mannisto was appointed to represent Defendant, after Schum's withdrawal.  ECF No. 30.  CJA counsel Randall Hironaka was then appointed to represent Defendant on February 22, 2023.  ECF No. 33.  On September 19, 2023, Andrew Marcantel, an attorney in private practice from Chandler, Arizona, entered an appearance on behalf of Defendant.  ECF No. 50.  On March 6, 2024, Marcantel withdrew as counsel and John Schum re-entered an appearance on behalf of Defendant, now as retained counsel.  *See* ECF Nos. 65, 66.  Schum represented Defendant at both her change of plea and sentencing hearings.

Defendant now makes a litany of arguments, many of which are barred, and others of which are without basis in fact or law.

---

[3]  Kanai thus represented Defendant both pre-indictment (from July 26, 2021 until May 26, 2022) and post-indictment (from May 26, 2022 until August 24, 2022).

4

**B.      Procedural Background**

Defendant filed her § 2255 Motion on January 23, 2026.  ECF No. 124.  The United States filed its response on March 20, 2026, ECF No. 143, and Defendant filed a reply on April 1, 2026.  ECF No. 146.[4]

### III.  SECTION 2255 LEGAL STANDARDS

The court's review is governed by 28 U.S.C. § 2255(a), which provides:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

A court may deny a § 2255 motion if "it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief."  R. 4(b) Governing § 2255 Proceedings in the U.S. Dist. Cts.  A court need not hold an evidentiary hearing if the allegations are "palpably incredible" or "patently frivolous or false" or if the issues can be

---

[4] Defendant's husband and co-defendant, Christopher Mazzei, also filed a § 2255 Motion on January 23, 2026, raising many of the same arguments that Defendant does.  Because the two motions raise many of the same issues, this Order often parallels the Order on Christopher Mazzei's § 2255 Motion.

conclusively decided based on the evidence in the record. *Blackledge v. Allison*, 431 U.S. 63, 76 (1977) (internal quotation marks and citation omitted); *see also United States v. Mejia-Mesa*, 153 F.3d 925, 929 (9th Cir. 1998) (explaining that a "district court has discretion to deny an evidentiary hearing on a § 2255 claim where the files and records conclusively show that the movant is not entitled to relief"). Conclusory statements in a § 2255 motion are insufficient to require a hearing. *United States v. Johnson*, 988 F.2d 941, 945 (9th Cir. 1993) (citation omitted). Instead, to require a hearing, a petitioner must allege specific facts that, if true, would entitle the petitioner to relief. *See United States v. Rodrigues*, 347 F.3d 818, 824 (9th Cir. 2003) (citing *United States v. McMullen*, 98 F.3d 1155, 1159 (9th Cir. 1996)).

Several limitations to raising a collateral attack apply to Defendant's § 2255 Motion. These include restrictions precluding a collateral attack based on: (1) a plea of guilty; (2) a plea agreement waiver (other than a claim of ineffective assistance of counsel); (3) procedural default; and (4) a claim relating to a forfeiture or restitution order. Further, if "a petitioner does not allege lack of jurisdiction or constitutional error, an error of law will not provide a basis for habeas relief unless that error resulted in a complete miscarriage of justice or in a proceeding inconsistent with the rudimentary demands of fair procedure."

*Hamilton v. United States*, 67 F.3d 761, 763–64 (9th Cir. 1995) (internal quotation

marks omitted); *United States v. Addonzio*, 442 U.S. 178, 185 (1979).

First, as to a plea of guilty, *Tollett v. Henderson*, 411 U.S. 258, 267

(1973), explained:

> [A] guilty plea represents a break in the chain of events
> which has preceded it in the criminal process.  When a
> criminal defendant has solemnly admitted in open court
> that he is in fact guilty of the offense with which he is
> charged, he may not thereafter raise independent claims
> relating to the deprivation of constitutional rights that
> occurred prior to the entry of the guilty plea.

Thus, "when the judgment of conviction upon a guilty plea has

become final and the offender seeks to reopen the proceeding [in a collateral

attack], the inquiry is ordinarily confined to whether the underlying plea was both

counseled and voluntary." *United States v. Broce*, 488 U.S. 563, 569 (1989).  This

general rule does not apply "where on the face of the record the court had no

power to enter the conviction or impose the sentence." *Id*.; *see also United States

v. Chavez-Diaz*, 949 F.3d 1202, 1207–08 (9th Cir. 2020) (explaining that the

exception "allows for constitutionally-based appeals—despite an unconditional

guilty plea—where the appeal, if successful, would mean that the government

cannot prosecute the defendant *at all*").  This exception exists where a defendant

challenges the government's jurisdiction to prosecute her for the charges to which

she pled guilty.  *See United States v. Garcia-Valenzuela*, 232 F.3d 1003, 1006–07

(9th Cir. 2000).  Such challenges include claims of vindictive prosecution, violation of the double jeopardy clause, challenges to the constitutionality of the statutes underlying the indictment, and claims that the indictment fails to state an offense.  *Id.* at 1005–06; *see also Class v. United States*, 583 U.S. 174, 178 (2018). And there is a limitation on raising these claims—they must "be proved by relying on the face of the indictment and on the record as it existed when the trial judge accepted the guilty plea."  *Garcia-Valenzuela*, 232 F.3d at 1006 n.2; *see also Broce*, 488 U.S. at 575–76.  In an ineffective assistance of counsel context, although "freestanding constitutional claims are unavailable to habeas petitioners who plead guilty, claims of pre-plea ineffective assistance of counsel are cognizable on federal habeas review when the action, or inaction, of counsel prevents petitioner from making an informed choice whether to plead."  *Mahrt v. Beard*, 849 F.3d 1164, 1170 (9th Cir. 2017).

Second, a waiver of appellate and/or § 2255 rights "is enforced if (1) the language of the waiver encompasses [the defendant's] right to appeal [or bring a collateral attack] on the grounds raised, and (2) the waiver is knowingly and voluntarily made."  *United States v. Rodriguez*, 49 F.4th 1205, 1212 (9th Cir. 2022) (internal quotation marks omitted).[5]  "To discern whether a waiver is

---

[5]  A waiver of the right to appeal is subject to the same analysis as a waiver of the right to bring a collateral attack.  *Rodriguez*, 49 F.4th at 1211–12 & n.3.

knowing and voluntary, we must ask 'what the defendant reasonably understood to be the terms of the agreement when he pleaded guilty.'" *United States v. Medina-Carrasco*, 815 F.3d 457, 461 (9th Cir. 2016) (quoting *United States v. De la Fuente*, 8 F.3d 1333, 1337 (9th Cir. 1993)).  The court assesses the knowing and voluntary nature of a waiver "by assessing the knowing and voluntary nature of the plea agreement as a whole." *Rodriguez*, 49 F.4th at 1212.  "A plea agreement is made knowingly if the defendant understands the terms and, to a certain extent, the consequences of the agreement.  A plea agreement is made voluntarily if the defendant is not induced by promises or threats to enter the agreement." *Id*. (footnote, internal citation, and quotation marks omitted).  In other words, as to Defendant, the § 2255 waiver is enforceable other than to claims of involuntariness of the waiver itself or a claim of ineffective assistance of counsel. *See, e.g.*, *United States v. Abarca*, 985 F.2d 1012, 1014 (9th Cir. 1993); *United States v. Pruitt*, 32 F.3d 431, 433 (9th Cir. 1994) (determining that a defendant may waive the right to file a § 2255 motion to challenge the length of her sentence); *Wondra v. United States*, 2024 WL 4665670, at *3 (D. Idaho Nov. 4, 2024) ("A defendant may waive his statutory right to file a § 2255 motion challenging his sentence, and that waiver is enforceable."); *see also United States v. Johnson*, 67 F.3d 200, 203 (9th Cir. 1995) (explaining that a defendant who does not "foresee the specific issue that he now seeks to appeal does not place that issue outside the scope of his waiver");

9

*United States v. Goodall*, 21 F.4th 555, 562 (9th Cir. 2021) ("When a defendant waives his appellate rights, he knows that he is giving up all appeals, no matter what unforeseen events may happen.").

Third, a § 2255 defendant procedurally defaults claims that could have been raised on direct appeal but were not. *Bousley v. United States*, 523 U.S. 614, 622 (1998). Procedural default can be overcome if a defendant demonstrates either cause and actual prejudice or actual innocence. *Id*. Cause "must be something external to the [movant], something that cannot fairly be attributed to him." *Coleman v. Thompson*, 501 U.S. 722, 753 (1991) (emphasis omitted); *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Thus, a plea agreement appeal waiver provision does not constitute cause. *Garcia-Santos v. United States*, 273 F.3d 506, 508 (2d Cir. 2001); *Norris v. United States*, 2024 WL 4311671, at *8 (S.D. Ala. Sept. 5, 2024). A defendant who pled guilty is prejudiced if there is a reasonable probability that, but for the error, she would not have pled guilty. *United States v. Werle*, 35 F.4th 1195, 1198 (9th Cir. 2022). Exceptions to the cause and prejudice requirement include (1) claims that could not be presented without further factual development, and (2) ineffective assistance of counsel claims. *United States v. Braswell*, 501 F.3d 1147, 1149 n.1 (9th Cir. 2007).

And last, a § 2255 motion cannot be used as a vehicle to collaterally attack a restitution or forfeiture order:

> 28 U.S.C. § 2255 is available to prisoners claiming the right to be released from custody.  Claims for other[] types of relief, such as relief from a restitution order, cannot be brought in a § 2255 motion, whether or not the motion also contains cognizable claims for release from custody.

*United States v. Thiele*, 314 F.3d 399, 400 (9th Cir. 2002); *United States v. Finze*, 428 F. App'x 672, 677 (9th Cir. 2011) (applying *Thiele* to bar a § 2255 challenge to a forfeiture order); *United States v. Kealoha*, 2023 WL 3505328, at *4 (D. Haw. May 17, 2023); *see also* 28 U.S.C. § 2255(a).

Because the court concludes that the § 2255 Motion can be decided conclusively based on the existing record, the court will not hold an evidentiary hearing.  Further, the court decides the § 2255 Motion without a hearing pursuant to Criminal Local Rule 12.2(a)(1).

## IV.  ANALYSIS

Defendant raises a myriad of grounds in her § 2255 Motion.  The court begins with Defendant's claims of ineffective assistance of counsel and then addresses Defendant's remaining claims.

### A.    Ineffective Assistance of Counsel Claims

#### 1.    *Legal Standard*

The Sixth Amendment guarantees the right to effective assistance of counsel at all critical stages of a criminal proceeding, including sentencing.  *See United States v. Gonzalez*, 113 F.3d 1026, 1029 (9th Cir. 1997).  To prevail on an

11

ineffective assistance of counsel claim, a petitioner must show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984). That is, the petitioner must show not only that there was a deficiency, but that the deficiency was prejudicial. *Id*. at 692; *see also Wiggins v. Smith*, 539 U.S. 510, 521 (2003) ("An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense."). "[I]t is unnecessary to consider the prejudice prong of *Strickland* if the petitioner cannot even establish incompetence under the first prong." *Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998) (citing *Hendricks v. Calderon*, 70 F.3d 1032, 1039 (9th Cir. 1995)).

Counsel "is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id*. at 690–91. Conclusory allegations of ineffective assistance of counsel made with no factual or legal explanation fall well

12

short of stating a cognizable claim for ineffective assistance of counsel. *See Blackledge*, 431 U.S. at 74 ("[P]resentation of conclusory allegations unsupported by specifics is subject to summary dismissal . . . ."). Further, "[s]tatements made by a defendant during a guilty plea hearing carry a strong presumption of veracity in subsequent proceedings attacking the plea." *United States v. Ross*, 511 F.3d 1233, 1236 (9th Cir. 2008); *Blackledge*, 431 U.S. at 73–74 ("[T]he representations of the defendant [at a plea hearing] . . . constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity."); *see also United States v. Morrison*, 113 F.3d 1020, 1021 (9th Cir. 1997) ("Any attempt to contradict the factual basis of a valid plea must fail."); *United States v. Yamashiro*, 788 F.3d 1231, 1237 (9th Cir. 2015) (finding that the district court did not err in denying a motion to withdraw a guilty plea where the defendant's under-oath statements during a change-of-plea hearing contradicted her contention that the plea was not voluntary and knowing). Absent a showing of extraordinary circumstances, a defendant cannot overcome the presumption of veracity that attaches to under-oath statements. *Muth v. Fondren*, 676 F.3d 815, 821–822 (9th Cir. 2012) (citing cases); *see also, e.g., Favela-Astorga v. United States*, 2024 WL 4416977, at *5 (D. Ariz. Oct. 4, 2024); *Chipman v. United States*, 2023 WL 2184633, at *3 (W.D. Wash. Feb. 23, 2023).

13

### 2.    *Allegations of Ineffective Assistance of Counsel Against Kanai*

As set forth above, Kanai represented Defendant both pre-indictment (from July 26, 2021 until May 26, 2022) and post-indictment (from May 26, 2022 until August 24, 2022).  Defendant claims that for the pre-indictment period, Kanai told her "just wait to hear from the prosecutor."  ECF No. 124 at PageID.1311.  This passive approach, per Defendant, resulted in no "actual work" being done, and thus Kanai was deficient in her pre-indictment representation.  *Id*.

Defendant's argument fails as a legal matter—an attorney cannot provide ineffective assistance of counsel pre-indictment.  *See United States v. Olson*, 988 F.3d 1158, 1160 (9th Cir. 2021) (stating that Sixth Amendment right to effective assistance of counsel does not attach prior to the time that a defendant is formally charged).  And Defendant makes no claim that Kanai was ineffective during the three-month period when Kanai represented her post-indictment.

Further, Defendant fails to argue, let alone prove, any prejudice from Kanai's alleged shortcomings (whether pre-indictment or post-indictment).  *See Rodriguez*, 49 F.4th at 1213 (explaining that to prove prejudice a defendant must demonstrate that absent deficient performance by counsel, she would "either have gone to trial or received a better plea bargain") (citations omitted).  And finally, Defendant has not shown that Kanai's representation prevented her "from making an informed choice whether to plead."  *Mahrt*, 849 F.3d at 1170.  In short,

14

Defendant's conclusory statements are insufficient to meet her burden. *Blackledge*, 431 U.S. at 74 ("[P]resentation of conclusory allegations unsupported by specifics is subject to summary dismissal . . . .").

### 3. *Allegations of Ineffective Assistance of Counsel Against Schum*

Liberally construed, Defendant claims that Schum provided ineffective assistant of counsel because he: (i) failed to "mount any defense, object to, demand recusal, or otherwise attempt to mitigate" based on Schum informing Defendant that the court was "upset, acting on emotion and not as an impartial mediator"; (ii) retired from the practice of law after the sentencing hearing, which "calls into question the effectiveness of the defense that Schum mounted"; (iii) failed to disclose a potential conflict of interest based on a close relationship between Schum and the assigned Assistant United States Attorney ("AUSA"); (iv) threatened "to quit right before sentencing hearing"; (v) failed to argue actual loss versus intended loss under the sentencing guidelines; (vi) failed to present "crucial evidence," including "evidence that banks were not fully knowledgeable of the guidelines of the PPP program, banks that were now being incentivized to turn in those that had received PPP loans, and legitimate business evidence of the Ohana Project"; (vii) failed to argue improper venue; (viii) failed to argue a *Brady*

15

*v. Maryland*, 373 U.S. 83 (1963) violation[6]; (ix) failed to point out misstatements made by the prosecutor during sentencing; (x) failed to question the court's comments regarding restitution and forfeiture at sentencing; (xi) failed to object to a plea agreement that prohibited "ALL downward departures"; (xii) failed to object when a DOJ investigator posed as a court official and called to verify a character letter provided to the court; and (xiii) failed to object when the AUSA threatened to prosecute Defendant's mother-in-law.  *See* ECF No. 124 at PageID.1299–1302, 1311–1314.[7]  In her reply, Defendant also argues that: (xiv) her plea of guilty was involuntary based on Schum's claim that he "would not be part of [Defendant's] pleading guilty, if she truly believed she was innocent."  *See* ECF No. 143-2 at PageID.1623–1624 and ECF No. 146.

The court addresses each claim in turn.

---

[6]  Under *Brady*, "the prosecution has an obligation, imposed by the Due Process Clause, to produce evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment.  Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Cano*, 934 F.3d 1002, 1022 (9th Cir. 2019) (brackets, internal citations and quotation marks omitted).

[7]  Defendant also claims the Sixth Amendment was violated because a "personal injury attorney" handled her criminal case.  ECF No. 124 at PageID.1303.  But Schum, during the change of plea and sentencing hearings, was privately retained by Defendant, not appointed by the court.  And Kanai, as the federal public defender for the District of Hawaii, does not practice personal injury law.  Finally, to the extent Defendant is referring to other CJA counsel, they are experienced criminal defense attorneys.  This claim is both conclusory and not based in fact.

i.      Failing to mount a defense based on the court being "upset"

Defendant claims that even though Schum told her that the court was "upset, acting on emotion and not an impartial mediator," he "did not mount any defense, object to, demand recusal, or otherwise attempt to mitigate the effect that this had on the case." ECF No. 124 at PageID.1311. This allegation fails for several reasons.

First, some background—at the time the Mazzeis entered their pleas of guilty, they had two minor children, ages 10 and 12. ECF No. 114 at PageID.1089. Given this fact, at the conclusion of the change of plea hearing the court informed counsel and Defendants that the court would consider staggered sentences. The court asked the parties to discuss this possibility—but the court also stated that it would be more open to staggered sentences if one of the defendants began to serve his or her sentence before the sentencing date. *Id*. at PageID.1089–1094. Although the parties failed to follow this advice, they still requested staggered sentences at the sentencing hearing. ECF No. 115 at PageID.1152. The court agreed to a staggered sentence, but made clear that Defendant (who selected to serve her sentence before her husband) would have to self-surrender two weeks after sentencing. *Id*. at PageID.1154. Defendant then said, in addition to the children, there was an issue regarding their house. *Id*. The court responded that "you've had plenty of time to worry about your house. I don't want to hear it. I

17

don't care.  I care about your children."  *Id*.  This is the sole time that the court

showed irritation with Defendant, which was based on the fact that Defendant was

asking for even more time to self-surrender even though the court stated that it

would be more open to staggered sentences if one defendant began serving their

sentence before the sentencing hearing.  Schum, in his declaration, summarizes his

conversation with Defendant after sentencing:

> After sentencing, Ms. Mazzei wanted me to go back into
> court and ask Judge Seabright to allow her to self-
> surrender to the place where she would be serving her
> sentence.  I explained that the location she would be
> serving her sentence might not be known by her report
> date.  If the place she was designated had been
> determined before her report date, I explained how she
> could ask her probation officer to make the request and
> that Judge Seabright would likely allow it.
>
> She demanded that I go back into court and try and
> convince Judge Seabright to allow her to remain out
> longer so that she did not have to report to FDC
> Honolulu.  I told her that I did not believe Judge
> Seabright was really happy with us right now.  I
> explained how Judge Seabright expected that either her
> or her husband would turn themselves in shortly after the
> change of plea as part of his willingness to consider
> staggered sentences.  The fact that neither of them
> surrendered early and that they were now asking to self-
> surrender in six to seven weeks after being sentenced did
> not likely sit well him [sic].  I explained how he was
> compassionate enough not to have one of them taken into
> custody immediately following sentencing so that they
> had time to prepare their young children for what
> was happening.  In my opinion, I did not believe Judge
> Seabright would change his mind and I refused to go
> back into Court to make the request.

18

ECF No. 143-2 at PageID.1627–1628.

Schum's recitation is correct—the court was not happy that the parties had ignored its request during the change-of-plea hearing, and then at sentencing Defendant requested *additional* time to self-surrender. But Schum was neither deficient, nor did this event cause Defendant any prejudice. Schum was not deficient in failing to ask the court to reconsider its decision post-sentencing, and there could be no prejudice as the events that occurred *after* the court imposed sentence. This claim is meritless.

ii.     Retirement from the practice of law

Defendant claims that Schum's retirement from the practice of law after her sentencing "calls into question the effectiveness of the defense that Schum mounted." ECF No. 124 at PageID.1311. But whether Schum provided effective assistance of counsel is not measured against the date of his retirement from the practice of law; it is measured against the record in this case. This claim is both conclusory and simply lacks any merit.

iii.    Failing to disclose a relationship with the AUSA

Defendant states that she has obtained "information after the case" that Schum and the assigned AUSA were close friends, that this relationship was never disclosed, and that this raises a potential conflict of interest. *Id.* Schum denies this claim, explaining that other than court matters, he has had no

19

"interaction with" the AUSA.  ECF No. 143-2 at PageID.1627.  But even if Schum and the AUSA were friends, Defendant fails to point out a conflict of interest as a result of the friendship.  *See Boadway v. Ludwick*, 2011 WL 5107599, at \*9 (E.D. Mich. Oct. 27, 2011) ("[I]t is not unusual for opposing attorneys to have friendly relationships outside of the courtroom, particularly in a small legal community. Without more, such a friendship does not state a colorable claim of a conflict of interest on the part of defense counsel."); *United States v. Welch*, 2015 WL 4924887, at \*14 (D. Md. Aug. 14, 2015) ("Lawyers in a community like Baltimore often know their legal adversaries and conduct themselves professionally.  Ms. Welch is grasping at straws."); *Howard v. United States*, 2007 WL 1810709, at \*16 (D. Me. June 21, 2007), *report and recommendation adopted* (July 23, 2007) ("[I]t quite simply is not unusual that attorneys on opposing sides of the courtroom share friendly, non-professional relationships.  Without more, this banter does not raise a tenable claim of a conflict of interest on the part of defense counsel.").

Further, a defendant alleging an ineffective assistance of counsel claim based on a conflict of interest "must show 1) that counsel actively represented conflicting interests, and 2) that an actual conflict of interest adversely affected his lawyer's performance." *Mannhalt v. Reed*, 847 F.2d 576, 579 (9th Cir.

1988); *see also United States v. Christakis*, 238 F.3d 1164, 1168 (9th Cir. 2001).[8]

Defendant has made neither of these showings

> iv.    Threatening to quit before sentencing

Without any further explanation, Defendant states that Schum

"threatened to quit right before sentencing hearing."  ECF No. 124 at

PageID.1299.[9]  Defendant does not explain how this threat resulted in deficient

performance, or how she was prejudiced by it.  Further, as is obvious, Schum did

represent Defendant through the sentencing hearing.  Thus, this claim fails.

> v.    Failing to argue "actual loss" versus "intended loss" under the
>         guidelines

Defendant claims that under "the standard set forth in *[United States]*

*v. Banks*, 55 F.4th 246 (3d Cir. 2022), the court should have calculated the

sentence using *actual* loss" under the sentencing guidelines.  *Id*. at PageID.1313.

Although not clear, Defendant appears to claim that the court applied an intended

---

[8]  To prove an adverse effect, a showing of actual prejudice is not required.  Instead, a defendant must show that some effect on counsel's handling of particular aspects of the case was likely.  *Christakis*, 238 F.3d at 1170.

[9]  In Schum's declaration submitted by the government in opposition to the § 2255 Motion, Schum denies that he threatened to "quit" prior to sentencing.  ECF No. 143-2 at PageID.1626.  Instead, he states that if Defendant maintained that she was innocent at the sentencing hearing (after having admitted illegal conduct during the change of plea), he "would not be part of perpetrating a fraud on the court.  I would be willing to take the case to trial, but I would not allow her to compromise my ethical obligations . . . ."  *Id.*

loss amount, but Schum should have argued for an application of actual loss. Defendant is mistaken.

First, some additional background—Defendant's fraudulent conduct involved Paycheck Protection Program ("PPP") loans under the Coronavirus Aid, Relief, and Economic Security Act.  Defendant stipulated in her plea agreement to certain facts, including that she and her husband conspired to obtain PPP funds by submitting false and fraudulent loan applications and supporting documentation, while concealing the fact that they submitted multiple PPP loan applications. Further, as a "result of the scheme, [Defendant] and Christopher Mazzei obtained approximately $1,365,000.00 in PPP funds to which they were not entitled, which they used to pay for personal expenses and an unallowable new business venture." ECF No. 79 at PageID.301.  Specifically, Defendant and her husband's PPP fraud resulted in the payment to them of: $92,500 from "Bank 1;" $562,500 from "Bank 2"; and $710,332 from "Bank 3."  *Id*. at PageID.302–306.

In determining the loss, the presentence investigation report determined that Defendant fraudulently obtained a total of $1,365,332 in PPP loans.  ECF No. 98 at PageID.756, 762.  Under guideline § 2B1.1, the report applied a base offense level 7 and a 14-level increase based on the loss of

$1,365,332.[10]  *Id*. at PageID.763.  At sentencing, Schum did object to the total loss amount, and the court determined that $1,365,332 was the loss amount that applied to Defendant.  ECF No. 115 at PageID.1100.

Thus, Defendant's argument is premised on a mistaken view—that the court calculated intended loss, not actual loss, in determining total loss.  In fact, the loss was premised on the amount of fraudulently obtained funds from three separate banks.  That represents actual, not intended, loss.  And the § 2255 Motion does not claim that Schum could have presented evidence to offset the loss amount, such as money returned *before* Defendant's offense was detected.  *See* Guideline § 2B1.1, application note 3(D) (stating that loss shall be reduced by money returned "to the victim before the offense was detected").[11]  In short, Schum was not deficient in failing to argue actual loss at sentencing.

vi.    Failing to present "crucial" evidence

Defendant claims that Schum failed to present "crucial" evidence, including that "banks were not fully knowledgeable of the guidelines of the PPP program" and banks "were now being incentivized to turn in those that had

---

[10]  The 14-level increase was based on a loss of between $500,000 and $1,500,000 under § 2B1.1(b)(1)(H).

[11]  *United States v. Banks*, 55 F.4th 246 (3d Cir. 2022), which held that the pre-2024 Guidelines requires a calculation based only on actual loss, is simply irrelevant.  Even if *Banks* applied in the Ninth Circuit, *see United States v. Hackett*, 123 F.4th 1005 (9th Cir. 2024), the court used the calculation—actual loss—approved by *Banks*.

received PPP loans." ECF No. 124 at PageID.1311. This argument fails—whether the banks were "not fully knowledgeable" about the PPP program, or whether they have been "incentivized" to report PPP fraud, is simply irrelevant to the issues before the court. As a result, Schum was not deficient in failing to raise these matters; and even if he was, there could be no prejudice.

### vii.   Failing to argue improper venue

Defendant claims that counsel (whether Schum or perhaps Kanai as well) was ineffective for failing to challenge venue in the District of Hawaii. *Id*. at PageID.1313. Because venue was proper in the District of Hawaii as to both counts 1 and 3 of the Indictment, this claim necessarily fails.

A criminal defendant "has a constitutional right to be tried in a district where the crime was committed." *United States v. Lukashov*, 694 F.3d 1107, 1119 (9th Cir. 2012). And Federal Rule of Criminal Procedure 18 provides that "[u]nless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed." Venue must be proper as to each count in an indictment. *United States v. Pace*, 314 F.3d 344, 349 (9th Cir. 2002).

To decide whether venue is proper the court "must initially identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts." *United States v. Rodriguez–*

*Moreno*, 526 U.S. 275, 279 (1999).  To determine the "nature of the crime," the court looks to the "essential conduct element[s]" of the offense.  *Id*. at 280.

Unless otherwise provided by law, "any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed."  18 U.S.C. § 3237(a).  And it is "well settled that venue on a conspiracy charge is proper where . . . any overt act committed in furtherance of the conspiracy occurred."  *United States v. Gonzalez*, 683 F.3d 1221, 1224 (9th Cir. 2012); *see also United States v. Hui Hsiung*, 778 F.3d 738, 746 (9th Cir. 2015).

Count 1 charged Defendant with conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1343, 1349.[12]  ECF No. 1 at PageID.6–16.  Specifically, that count charges that by email Christopher Mazzei submitted a fraudulent application and records to the Bank of Hawaii,[13] which is a bank based and headquartered in Hawaii, in support of a loan application seeking over $710,000 in PPP funds.  *Id*. at PageID.13.  Given these facts, there was no factual or legal basis for counsel to have challenged venue as to count 1 in the District of Hawaii.  *See*

---

[12]  There is no specific venue statute covering wire fraud or conspiracy to commit wire fraud.

[13]  The Indictment refers to "Bank 3" as "based" and "headquartered" in the State of Hawaii," and the presentence report specifically identified "Bank 3" as the Bank of Hawaii.  *See* ECF No. 1 at PageID.5, 13 and ECF No. 98 at PageID.755–756.

*Pace*, 314 F.3d at 349) (stating that venue is established in a wire fraud case "in those locations where the wire transmission at issue originated, passed through, or was received"); *United States v. Meyers*, 847 F.2d 1408, 1411 (9th Cir. 1988) ("It is not necessary that Meyers himself have entered or otherwise committed an overt act within the district, as long as one of his co-conspirators did.").

Count 3 charged Defendant with conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956(h) and 1957. For this violation, a specific venue provision applies:

(i) Venue.

(1) Except as provided in paragraph (2), a prosecution for an offense under this section or section 1957 may be brought in—

(A) any district in which the financial or monetary transaction is conducted; or

(B) any district where a prosecution for the underlying specified unlawful activity could be brought, if the defendant participated in the transfer of the proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted.

(2) A prosecution for an attempt or conspiracy offense under this section or section 1957 may be brought in the district where venue would lie for the completed offense under paragraph (1), or in any other district where an act in furtherance of the attempt or conspiracy took place.

(3) For purposes of this section, a transfer of funds from 1 place to another, by wire or any other means, shall

> constitute a single, continuing transaction.  Any person
> who conducts (as that term is defined in subsection
> (c)(2)) any portion of the transaction may be charged in
> any district in which the transaction takes place.

18 U.S.C. § 1956(i)(1)–(3).

Here, among the financial transactions listed in count 3 was a

$175,000 "[w]ire transfer by ERIN MAZZEI from Bank 5 acct. no. x0096 to

T.G.E.S., an entity based in the District of Hawaii, for down payment on a Koio

Drive condo."  ECF No. 1 at PageID.19.[14]  Venue is thus proper in the District of

Hawaii as a "district in which the financial or monetary transaction is

conducted."[15]  Again, because there was no factual or legal basis for counsel to

challenge venue in the District of Hawaii, counsel was not deficient.

> viii.    Failing to argue a *Brady* violation

Defendant claims that Schum failed to argue that the government

violated its *Brady* obligation.[16]  Specifically, she claims that the government

suppressed emails "from the loan originators that explicitly stated that payroll

---

[14] "T.G.E.S." is Title Guaranty Escrow Services.  *See* ECF No. 99 at PageID.794.  It makes sense that funds were transferred to a Hawaii title and escrow company because, as alleged in the Indictment, the "Koio Drive condo" is located in Kapolei, Hawaii.  *See* ECF No. 1 at PageID.21 (forfeiture allegation).

[15] "[T]he term 'conducts' includes initiating, concluding, or participating in initiating, or concluding a transaction . . . ."  18 U.S.C. § 1956(c)(2).

[16] Defendant also claims that the prosecution engaged in other forms of prosecutorial misconduct beyond a *Brady* violation.  Those allegations are discussed separately in this Order.

projections were acceptable for PPP loan applications."  ECF No. 124 at

PageID.1312.

A defendant may raise a pre-plea *Brady* claim only to challenge the

voluntariness of a guilty plea.  *United States v. Sanchez*, 50 F.3d 1448, 1453 (9th

Cir. 1995).[17]  To prevail, Defendant must demonstrate that "there is a reasonable

probability that but for the failure to disclose the *Brady* material, the defendant

would have refused to plead and would have gone to trial."  *Id*. at 1454. The test to

determine whether a defendant would have gone to trial is an objective one that

centers on the likely persuasiveness of the withheld information.  *Id*. (quotation

marks and citation omitted).

First, Defendant's argument falls under its own weight.  If the defense

was aware of the loan originator emails, then there was no *Brady* violation.  *See*

*Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006) (finding no *Brady* violation if the

defendant is aware of the essential facts that enable him to take advantage of the

---

[17]  In *United States v. Ruiz*, 536 U.S. 622, 633 (2002), the Supreme Court concluded that "the Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant."  *Ruiz* creates some tension with *Sanchez*.  *See, e.g.*, *Parker v. County of Riverside*, 78 F.4th 1109, 1117–18 (9th Cir. 2023) (reiterating that "as I have previously noted, [the Ninth Circuit's] holding that *Brady* applies during plea bargaining conflicts with the Supreme Court's decision in [*Ruiz*]," and stating that "we should revisit this issue with the benefit of *Ruiz*. . . in an appropriate case") (R. Nelson, J. concurring) (citing *United States v. Harshman*, 2021 WL 3929926, at *2–4 (9th Cir. Sep. 2, 2021) (R. Nelson, J., concurring)).  Nevertheless, this Order applies *Sanchez* as binding precedent in the Ninth Circuit, under which Defendant's claim still fails (and so this is not an "appropriate case" to revisit the tension between *Sanchez* and *Ruiz*).

28

exculpatory evidence).[18]   And if Schum was unaware of the emails, then he could not have been ineffective in failing to argue a *Brady* violation.  Second, in any event, the alleged emails do not constitute *Brady* material.  Defendant's conviction was not based on inaccurate payroll projections—instead, Defendant admitted under oath at her change of plea hearing to multiple fraudulent statements unrelated to payroll projections that were made in relation to the PPP loans.  *See* ECF No. 114 at PageID.1059–1079.[19]   Stated differently, the content of the alleged emails stating that "payroll projections were acceptable for PPP loan applications," was not material to Defendant's guilt or punishment.  *Brady*, 373 U.S. at 87.  And third, even if the emails were *Brady* material, and even if Schum should have argued they were being withheld, Defendant has not shown a reasonable probability that but for the failure to disclose the *Brady* material, she would have refused to enter a guilty plea and would have gone to trial instead.

---

[18]  Defendant appears to have been aware of this "*Brady*" information as early as March 30, 2020.  *See* ECF No. 124 at PageID.1353–1355 (setting forth an email chain from March 29 and 30, 2020 between Christopher Mazzei and South End Capital containing an alleged exculpatory email) and PageID.1323 (email from Christopher Mazzei to his attorney stating that several loan originators informed him that he could use payroll projections to apply for a PPP loan).

[19]  For example, Defendant admitted that she falsely and fraudulently certified in relation to the loan from "Bank 1" that she did not have an ownership interest in another business, and that she would not receive another PPP loan in 2020.  ECF No. 114 at PageID.1076.  She also admitted to providing false records to "Bank 1," including false payroll records and a false IRS Form 941.  *Id*. at PageID.1077.  And Defendant admitted that she engaged in this conduct with the intent to defraud.  *Id*.

         ix.    Failing to point out misstatements made by the prosecutor
during sentencing

Defendant further claims that Schum did not argue or correct various alleged misstatements made by the AUSA during sentencing.  ECF No. 124 at PageID.1312.  Specifically, she alleges that the AUSA falsely stated that

> the Kapolei condo was purchased solely for a VRBO
> vacation home; the claim that the PPP funds were used to
> pay off the Arroyo Grande, California home mortgage;
> the claim that [Defendant] purchased a billboard to get
> the attention of Dawyne "The Rock" Johnson; and the
> mischaracterization of the Ohana Project as a "vanity
> television project."[20]

Id. at PageID.1312.  These arguments fail.

During the change of plea hearing, the government provided the following proffer as to how Defendant and her husband spent the fraudulently-obtained PPP funds:

> And upon receiving the aforementioned PPP loan funds,
> Christopher Mazzei and Erin Mazzei moved the funds
> into their bank accounts and began spending the funds on
> unallowable personal and other expenses.  Among the
> notable personal expenses made by Christopher Mazzei
> and Erin Mazzei were a $39,445 payment for the
> mortgage on their home in Arroyo Grande, California;
> $175,500 for the purchase of a home in Kapolei, Hawaii;
> and $125,877 for the purchase of two vehicles.

---

[20]  Elsewhere in the § 2255 Motion, Defendant claims that Schum failed to present "legitimate business evidence" of the Ohana Project.  ECF No. 124 at PageID.1312.

> Christopher Mazzei and Erin Mazzei also committed
> $793,000 of PPP funds to a third party production
> company to develop various film and television projects.
> Of this amount, they spent approximately $164,796 to
> film a promotional trailer for a television project entitled
> Ohana that they planned to produce in the State of
> Hawaii.

ECF No. 114 at PageID.1066.  When asked by the court if the AUSA's proffer was

accurate, Defendant stated, "Yes."  *Id*. at PageID.1066–1067.  Defendant thus

admitted under oath that she and her husband used $39,445 of PPP proceeds

towards the mortgage on their home in Arroyo Grande, California.  This statement

"carr[ies] a strong presumption of veracity in subsequent proceedings attacking the

plea."  *Ross*, 511 F.3d at 1236.[21]

Further, Defendant admitted that she used $175,500 of PPP funds for

the purchase of a home (condo) in Kapolei, Hawaii.  Against this backdrop, at

sentencing the AUSA stated that Defendant and her husband put the Kapolei condo

"on a vacation rental service called VRBO, and they pulled in $41,000 from

renting that condominium in Kapolei, Hawaii."  ECF No. 115 at PageID.1122.

Contrary to Defendant's claim, the AUSA never stated that the condo was used

"solely" as a vacation rental.  ECF No. 124 at PageID.1312.  Instead, he set forth

---

[21]  To the extent Defendant claims that the AUSA incorrectly stated that PPP funds were used to "pay off" the mortgage as opposed to simply paying down the mortgage balance, any such misstatement would be immaterial.  And Schum was certainly not deficient in failing to raise such an inconsequential discrepancy.

facts which Defendant does not challenge—that the condo generated $41,000 through VRBO rentals.[22]  And at sentencing, Christopher Mazzei's counsel corrected any misimpression that could have been left by the AUSA—he told the court that "the VRBO rental didn't begin until after the fraud was discovered." ECF No. 115 at PageID.1139.  The court accepted that proffer as accurate. *Id*.  In short, any possible false impression left by the AUSA during sentencing was corrected.

As set forth above, Defendant also admitted that she and her husband spent $793,000 on a third-party production company.  In his remarks to the court during sentencing, the AUSA stated that Defendant and her husband "set aside $793,000 for a Vanity television project called Ohana, spending $164,000 to film a promotional trailer." *Id*. at PageID.1122.  Defendant appears to claim that Schum should have corrected the statement that these funds were spent on a "vanity" television project.  But given that Defendant admitted that she and her husband used fraudulently obtained PPP funds to support the Ohana project, it was quite reasonable for Schum to avoid a discussion of the project, and in particular not to nitpick as to whether it was a "vanity" project.[23]

---

[22]  The AUSA made this comment in response to Defendant's statement that the condo was purchased as a "home writing and production office as we started making connections in the Hawaii film industry."  ECF No. 115 at PageID.1122.  In short, the AUSA was pointing out that the condo was used—at least in part—as a vacation rental at some point in time.

(continued . . )

During sentencing, the AUSA also stated that Christopher Mazzei's "support letters include one letter from a production partner that explains that the Mazzeis hoped to attract the attention and support of a film actor with ties to Hawaii, Dwayne the Rock Johnson, and that was how they spent the PPP loan money." *Id.* The AUSA then pointed out that the purpose of the PPP was not to provide funds for new business ventures. *Id.* at PageID.1123. The reference letter, written by an individual that worked with Defendant on the Ohana project, states that Defendant and her husband "sold personal items to finance a billboard near Dwayne Johnson's Los Angeles residence, hoping to gain his support." ECF No. 103-1 at PageID.865; *see also* ECF No. 104-4 at PageID.918 (showing a photograph of the billboard, which states in part, "Let's Keep The Legacy of Filmmaking in Hawai'i Strong. OhanaTheSeries.com"). And in her § 2255 Motion, Defendant claims the billboard was financed by a family friend, ECF No. 124 at PageID.1330. But regardless of the actual source of funds, Defendant claims that Schum should have made clear that PPP funds were not used to purchase the billboard advertisement.

---

[23] To be clear, the court believed at sentencing, and believes now, that Defendant and her husband put funds into the Ohana project hoping that it would succeed and provide them with income. The court was never of the view that the Ohana project itself was illegitimate or illegal. But there is no dispute that funds used on the Ohana project were fraudulently obtained. And whether it was a "vanity" project has always been irrelevant to the court.

A defense counsel need not address every issue raised by a defendant during sentencing.  Strategic choices must be made, and those are "virtually unchallengeable." *Strickland*, 466 U.S. at 690.  Here, Defendant admitted under oath that she used a large part of the fraudulently obtained PPP funds to support the Ohana project.  It would make little sense for Schum to provide an accounting as to how much of the Ohana project was funded by illegal proceeds versus legal ones. What was material to the court was that Defendant obtained PPP funds through fraud, and then spent those proceeds, in part, on a television project—what specific funds went to a particular part of that project is simply not relevant.  Instead, it was well within the professional range of reasonableness for Schum to focus at sentencing (as he did) on more significant mitigating factors, such as Defendant's history, her community support, and her minor children.  *See* ECF No. 115 at PageID.1135–1136.  Given these facts, there was no reason for Schum to highlight Defendant's involvement in the Ohana project.  And, in any event, there was certainly no prejudice in failing to do so.  That is, even assuming that Schum should have raised these various arguments at sentencing, Defendant has failed to demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, she would have received a lesser sentence.

> x.    Failing to question the court's comments regarding restitution and forfeiture at sentencing

Liberally construed, Defendant argues that Schum was ineffective at the sentencing by failing to object to a "flawed restitution and forfeiture" order, and that Schum failed to question the court's "allusions to how recovered funds should work in relation to restitution, giving the impression that [Defendant] would not pay twice for the same amount." ECF No. 124 at PageID.1308, 1313.

The plea agreement, however, is very clear—Defendant would be required to pay full restitution *and* forfeiture. *See* ECF No. 79 at PageID.298–299, 315–320. The court highlighted this fact during the change of plea hearing, informing Defendant: "So, in addition to forfeiture, there would be a restitution order." ECF No. 114 at PageID.1035. Further, there is no double recovery if both restitution and forfeiture are ordered. "The two payments represent different types of funds: punitive and compensatory. They are different in nature, kind, and purpose." *United States v. Davis*, 706 F.3d 1081, 1084 (9th Cir. 2013). Given the requirement in the plea agreement for Defendant to pay both forfeiture and restitution, there was no reason for Schum to correct any misimpression that the court may have left with Defendant herself at the time of sentencing. Further, even if Schum should have explained the restitution and forfeiture obligation to

Defendant more clearly during sentencing, the failure to do so could not have prejudiced Defendant.[24]

>            xi.    Failing to object to a plea agreement that prohibited any
>                   downward departure

Defendant states that the AUSA "tendered a plea deal that prohibited ALL downward departures," and that Schum failed to object to this "misconduct." ECF No. 124 at PageID.1300.  Defendant is mistaken as to the nature of the plea agreement.

Under the plea agreement, Defendant was not permitted to "seek a variance or departure from the advisory guideline range as determined by the Court at the time of sentencing and therefore will argue for a sentence within the calculated advisory guideline range . . . ."  ECF No. 79 at PageID.309.  The plea agreement also made clear that this provision "is not binding on the Court."  *Id*.  In other words, Defendant's claim that the plea agreement prohibited *any* downward variance is simply incorrect.  The court had discretion to sentence below the guideline range, within the guideline range, or above the guideline range.

---

[24] Defendant also claims that "[a]ssets were seized a year before being charged, violating DOJ guidelines that state assets must be returned or charged filed within 90 days after seizer [sic]."  ECF No. 124 at PageID.1303.  Although unclear, Defendant may be referencing a 90-day period for the government to file a complaint if an individual makes a claim to seized property under 18 U.S.C. § 983(a)(3)(A).  Here, Defendant does not provide evidence (or even allege) that she filed a claim, and thus the 90-day period is inapplicable.  *See Snitko v. United States*, 90 F.4th 1250, 1258 n.5 (9th Cir. 2024) (explaining application of § 983(a)(3)(A)).

Further, Defendant provides no argument or evidence as to why the inclusion of this provision in the plea agreement constituted "prosecutorial misconduct." Defendant was aware of this provision, discussed it with Schum, and agreed to it. ECF No. 114 at PageID.1038–1039; ECF No. 143-2 at PageID.1625. Because there was no prosecutorial misconduct, Schum could not have been deficient in failing to raise the issue with the court.

      xii.   Failing to object when a DOJ investigator posed as a court official

Defendant claims that "a DOJ agent called character witness PJ Haarmsa the day before sentencing posing as a court official to 'verify' his character letter, but in reality, it was a DOJ investigator, which undermines the integrity of the investigation." ECF No. 124 at PageID.1312. In support of this claim Defendant attaches a text communication in which Haarmsa states that "the court just called me asking if my letter was legit." *Id*. at PageID.1350. When Haarmsa was asked for the phone number of the person who called, he provided a number starting with a 310 area code, and then wrote "Lynn the agent." *Id*. Given this communication, it appears that Haarmsa may have confused the difference between a court official and law enforcement. Regardless, Haarmsa identified the caller as an "agent," a person clearly not attempting to falsely claim affiliation with the court.

37

Further, even if these events happened, Defendant has failed to show that she was prejudiced by this in any way.  Had Schum made the court aware of this issue, it would not have been relevant to the court's consideration of the relevant 18 U.S.C. § 3553(a) factors or the ultimate sentence.  Any such failure by Schum did not constitute ineffective assistance of counsel.

> xiii.   Failing to object when the AUSA threatened to prosecute Defendant's mother-in-law

Defendant next claims the AUSA "used a tactic of threatening charges against [her] mother-in-law if [she] didn't sign the plea deal."  *Id*. at PageID.1312.  She provides no evidence that Schum relayed such a threat to her, or even that Schum was aware of such a threat.  More importantly, Defendant confirmed under oath that nobody threatened her or anyone else or forced her in any way to enter a plea of guilty.  ECF No. 114 at PageID.1028.  Instead, she stated that she was pleading guilty of her own free will because she was guilty.  *Id*. at 1028–1029.  Defendant also confirmed under oath that, other than the written plea agreement, there was no other agreement between Defendant and the United States (such as a non-prosecution agreement as to Defendant's mother-in-law).  *Id*. at PageID.1039.  In other words, although Defendant now claims that threats were made, she stated otherwise while under oath.  *See Blackledge*, 431 U.S. at 73–74 ("[T]he representations of the defendant [at a plea hearing] . . . constitute a formidable barrier in any subsequent collateral proceedings.  Solemn declarations in open

38

court carry a strong presumption of verity."). And Defendant has not presented a compelling explanation for the contradiction or demonstrated extraordinary circumstances to permit this claim to go forward. *See Muth*, 676 F.3d at 821–822 ("[A] motion that can succeed only if the defendant committed perjury at the plea proceedings may be rejected out of hand unless the defendant has a compelling explanation for the contradiction.") (quoting *United States v. Peterson*, 414 F3d 825, 827 (7th Cir. 2005)).

                xiv.    Failing to provide proper advice regarding plea options

          In her reply brief, for the first time, Defendant argues that Schum was ineffective by restricting "her ability to pursue alternative courses of action by conditioning representation of her on an admission of guilt." ECF No. 146 at PageID.1652. This argument was not raised in her § 2255 Motion, but instead is made in response to a Schum declaration provided by the government in opposition to the § 2255 Motion. In that declaration, Schum states that he explained Defendant's choice: proceed to trial or take a plea deal being offered by the government. ECF No. 143-2 at PageID.1623. Schum then explains:

> After considering my advice, Ms. Mazzei explained that her primary concern was spending the least amount of time incarcerated. She asserted that although she believed she did nothing wrong, she was willing to take the deal in order to limit her confinement. I told her that I could not ethically assist her with this course of action. For me to represent her in a guilty plea, there must be factual basis for her plea. In order for the court to

> establish that the plea was voluntary, knowing, and intelligent, she would need to tell the court that she was guilty of the offenses and explain how her actions and intentions amounted to the commission of the crimes to which she was pleading.  I told her that I would not be part of her pleading guilty, if she truly believed she was innocent.

*Id*. at PageID.1623–1624.  Schum explains that Defendant then informed him that she would accept the plea deal, and she confirmed that she was pleading guilty because she was guilty.  *Id*. at PageID.1624.  Schum states that prior to sentencing,

> I again reiterated to Ms. Mazzei that if during the sentencing she insisted on her innocence and was only taking a plea agreement to get a reduced sentence, I would not be part of perpetrating a fraud on the court.  I would be willing to take the case to trial, but I would not allow her to compromise my ethical obligations or let her confess to crimes she did not commit.

*Id*. at PageId.1626.

Against this background, Defendant's reply makes two arguments not raised in her § 2255 Motion.  First, she argues that Schum's condition on her plea of guilty—that he could not ethically assist her in entering a guilty plea if she falsely admitted guilt—removed her ability to proceed to trial.  ECF No. 146 at PageID.1651 (stating that Schum's position caused Defendant to "forfeit[ ] her right to trial"), 1652 (stating that Schum's position "eliminated" her option of going to trial), 1659 (stating that Schum's position removed the option of "proceeding to trial with counsel"), 1661 (stating that the "loss of trial itself

constitutes prejudice" under *Strickland*).  Second—and perhaps inconsistent with the first argument—Defendant claims that Schum's condition of her plea of guilty took away the option of pleading guilty while maintaining innocence.  *Id*. at PageID.1657–1658.

Arguments raised for the first time in a reply brief in a § 2255 proceeding are waived.[25]  *See United States v. Berry*, 624 F.3d 1031, 1039 n.7 (9th Cir. 2010) (declining to consider arguments raised for the first time in a § 2255 reply brief); *Delgadillo v. Woodford*, 527 F.3d 919, 930 n.4 (9th Cir. 2008) ("Arguments raised for the first time in [habeas] petitioner's reply brief are deemed waived."); *United States v. Jones*, 2025 WL 849231, at *4 n.4 (D. Ariz. Feb. 24, 2025), *report and recommendation adopted*, 2025 WL 842721 (D. Ariz. Mar. 18, 2025) (same); *United States v. Masuisui*, 2024 WL 778297, at *4, n.10 (D. Haw. Feb. 26, 2024), *reconsideration denied*, 2024 WL 1719943 (D. Haw. Apr. 22, 2024) (same).  But, regardless, Defendant's argument also fails on the merits.

---

[25]  Defendant's reply brief states that her § 2255 Motion sets forth facts, such as "counsel informed Defendant he would not continue representation unless she admitted guilt despite her prior assertion that she had 'done nothing wrong.'"  ECF No. 146 at PageID. 1654.  The § 2255 Motion makes no such argument.  Although the § 2255 Motion refers to a "coercive" plea agreement, that argument centers on the plea agreement terms and an alleged threat to prosecute Defendant's mother-in-law, not on Schum's refusal to participate in a plea of guilty if Defendant maintained her innocence.  *See* ECF No. 124 at PageID.1312, 1329, 1359.  In short, the arguments Defendant makes in her reply brief were not raised in the § 2255 Motion.

Defendant's claim that Schum's advice somehow eliminated or removed her ability to proceed to trial is simply inaccurate.[26] At no point does Schum's declaration state or imply that Schum would not represent Defendant at trial if she maintained her innocence. The opposite is true—Schum told Defendant that if she maintained her innocence, he would take the case to trial but not participate in a plea of guilty. *See* ECF No. 143-2 at PageID.1623 ("I explained her choices were to force the government to prove her guilt (and we could put on a defense if she desired) or she could take the deal being offered, which I also fully explained to her."). Schum's advice centered on whether he could participate in a plea of guilty if Defendant maintained her innocence, not whether he would represent her at trial. Defendant's claim otherwise is not based on fact and is rejected as wholly unsupported by the record.

As to Defendant's second argument, she states that Schum "refused to participate in the course of action Defendant initially sought—accepting the plea while maintaining that she had done nothing wrong—thereby making the available options turn on counsel's imposed condition rather than Defendant's independent choice." ECF No. 146 at PageID.1657–1658. But even if the court assumes that

---

[26] In her reply, Defendant does not present any new facts, but instead only makes argument based on Schum's declaration. In doing so, Defendant relies on and accepts the factual recitations in Schum's declaration as true—that is, there is no factual dispute as to the accuracy of Schum's declaration as it relates to his advice regarding Defendant's options to enter a plea or proceed to trial.

42

Schum was deficient in his advice regarding plea options, Defendant fails on the prejudice prong.[27]

Liberally construed, Defendant may be arguing that Schum should have sought a plea of nolo contendere or a plea pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970).[28]  In applying *Strickland* in the context of plea bargains, "a defendant must show the outcome of the plea process would have been different with competent advice." *Lafler v. Cooper*, 566 U.S. 156, 163

---

[27]  Because the court finds a lack of prejudice, the court need not determine whether Schum's advice was deficient.  In particular, the court need not address whether Schum's advice—that he would not be part of Defendant's plea of guilty if Defendant truly believed she was innocent—fell below an objective standard of reasonableness.  *See Nix v. Whiteside*, 475 U.S. 157, 171 (1986) (finding the counsel's refusal to participate in client's suggested perjury "falls well within accepted standards of professional conduct and the range of reasonable professional conduct acceptable under *Strickland*"); *see also* Hawaii Rule of Professional Conduct 3.3 (made applicable in this court by Criminal Local Rule 83.3 and stating that a lawyer shall not knowingly "fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client").  The court also need not determine whether the failure to provide a defendant with the possible option of a nolo contendere plea or a plea under *North Carolina v. Alford*, 400 U.S. 25 (1970), falls below an objective standard of reasonableness.  *See Carr v. United States*, 2009 WL 1867672, at *8 (N.D. W.Va. June 29, 2009) ("The Court has not found a case that holds that an attorney must inform or advise a client to consider entering an *Alford* plea.").

[28]  A defendant pleading nolo contendere "takes no position on guilt or innocence, whereas a defendant entering an *Alford* plea takes the position that he is not guilty." *United States v. Mancinas-Flores*, 588 F.3d 677, 681 (9th Cir, 2009).  "An *Alford* plea is simply shorthand for a guilty plea accompanied by a protestation of innocence." *Id*.  Further, while a plea of guilty—including an *Alford* plea—requires a factual basis, a nolo contendere plea does not.  *Id*. at 681–82.  And in determining whether a factual basis exists, the court may rely on anything that appears in the record. *Id*. at 682.  The court has broad discretion to accept or reject a nolo contendere plea after determining whether the plea is in the public interest. *Id*.  Whether a district court can reject an *Alford* plea appears to be in question in the Ninth Circuit. *See id.* at 682–83; *see also United States v. Neal*, 473 F. App'x 683, 684 (9th Cir. 2012) (stating that a conflict exists in the Ninth Circuit as to whether district courts have discretion to reject an *Alford* plea).

(2012).  To prevail on this claim Defendant must demonstrate a "reasonable

probability" that, had she been properly advised of her ability to enter an *Alford* or

nolo contendere plea, she would not have entered the plea as she did, but instead

would have entered an *Alford* or nolo contendere plea.  *See Hill v. Lockhart*, 474

U.S. 52, 59 (1985); *United States v. Silveira*, 997 F.3d 911, 915–16 (9th Cir. 2021).

Stated differently, Defendant must demonstrate that absent Schum's incompetence,

she would have "rationally" rejected the plea she entered, and would have either

gone to trial or "received a better plea bargain" instead.[29]  *Rodriguez*, 49 F.4th at

1213.  This test, requiring a "reasonable probability" or evidence that a defendant

would "rationally" reject a plea offer, is an objective one.  *See United States v.*

*Singh*, 95 F.4th 1028, 1033 (6th Cir. 2024) (stating that the "reasonable

probability" standard creates an objective, not subjective, inquiry); *Christian v.*

*Ballard*, 792 F.3d 427, 452 (4th Cir. 2015) ("When evaluating objective

reasonableness under the prejudice prong of *Strickland*, the challenger's subjective

preferences . . . are not dispositive; what matters is whether proceeding to trial

would have been objectively reasonable in light of all of the facts.") (brackets and

internal quotation marks omitted); *United States v. Dominguez*, 998 F.3d 1094,

---

[29]  Because Defendant pled guilty with an admission of guilt, she cannot be claiming that
she would have gone to trial if she had known of the possibility of an *Alford* plea or a plea of
nolo contendere.  Instead, Defendant is arguing that she wanted to enter a plea of guilty without
any admission of guilt.

1111 (10th Cir. 2021) ("Consistent with the proposition that a defendant's say-so is not enough, we have indicated that this prejudice inquiry is largely an objective one.").

Here, applying the objective standard, Defendant fails to demonstrate a "reasonable probability" that, had she been advised of her ability to enter an *Alford* or nolo contendere plea, she would have rejected the plea agreement she entered and instead would have entered a nolo contendere or *Alford* plea. *Lockhart*, 474 U.S. at 59.

Defendant's guideline level almost certainly would have been higher had she entered a nolo contendere or *Alford* plea. By pleading guilty and accepting responsibility for her illegal conduct, Defendant received a 3-level reduction in her guideline level. *See* Presentence Report ¶¶ 53–54, ECF No. 98 at PageID.763.[30] If Defendant maintained her innocence, this 3-level reduction likely would not have been applied with either a nolo contendere or an *Alford* plea. "[W]hile a reduction for acceptance of responsibility under a *nolo contendere* or *Alford* plea is not automatically barred by the nature of the plea, such a plea is, as a general proposition, inconsistent with the acceptance of responsibility and is a relevant

---

[30] Including that 3-level reduction, Defendant had a total offense level 17, criminal history category I, resulting in an advisory guideline range of 24 to 30 months. ECF No. 110 at PageID.996. Had she not received the 3-level acceptance of responsibility reduction, a total offense level 20, criminal history category I, would have resulted in an advisory guideline range of 33 to 41 months.

factor to consider when determining the sentence." *United States v. Gordon*, 979 F. Supp. 337, 342 (E.D. Penn. Oct. 1, 1997); *see also United States v. Haverstat*, 22 F.3d 790, 799 (8th Cir. 1994) (affirming district court's finding that defendant who pled nolo contendere and who minimized his criminal conduct was not entitled to a guideline acceptance of responsibility reduction); *United States v. Harris*, 751 F.3d 123, 126–27 (3d Cir. 2014) (finding that although a nolo contendere plea does not automatically preclude a district court from granting a reduction for acceptance, the district court did not err in denying such a reduction based on the facts of the case); *United States v. Harlan*, 35 F.3d 176, 181 (5th Cir. 1994) (affirming denial of acceptance of responsibility in *Alford* plea where the district court did not believe the defendant's "weak story").

Here, even if Defendant can show that she would have entered a nolo contendere or *Alford* plea, and that the court would have accepted it, she cannot show that such a plea would have resulted in the same or a lesser sentence. No reasonable person would trade a guideline range of 24 to 30 months for a range of 33 to 41 months. Stated differently, Defendant fails to demonstrate a "reasonable probability" that, had she been properly advised of her ability to enter an *Alford* or nolo contendere plea, she would have rejected the plea agreement that she ultimately accepted and instead would have entered an *Alford* or nolo contendere plea. *See Silveira*, 997 F.3d at 916 (finding that, where a defendant would likely

46

have faced a longer sentence by proceeding to trial rather than accepting a plea deal, and given the strength of the government's evidence, it was not plausible that the defendant would have decided to proceed to trial"). Defendant fails on the prejudice prong.

*     *     *

Defendant has failed to show that Schum provided ineffective assistance of counsel. The court now addresses the remaining claims in Defendant's § 2255 Motion.

## B. The Remainder of Defendant's Claims

### 1. The Plea Agreement Waiver Is Valid

Before discussing the specific claims that remain, the court must determine whether Defendant's plea agreement waiver of her § 2255 rights was knowing and voluntary. *Rodriguez*, 49 F.4th at 1212. It was both.

The language of the plea agreement itself is clear: Defendant waived her right "to challenge her conviction or sentence or the manner in which it was determined in any collateral attack, including, but not limited to, a motion brought under Title 28, United States Code, Section 2255." ECF No. 79 at PageID.312. This broad waiver contained one exception applicable here: a claim based on ineffective assistance of counsel. *Id*. During Defendant's change of plea hearing, the court explained the waiver in detail, and she confirmed that she understood

47

both the nature and scope of the waiver.  ECF No. 114 at PageID.1042–1044.

Further, after a full colloquy, Defendant confirmed that she understood the terms

of the plea agreement and its consequences.  *Id*. at PageID.1037–1039.  And, other

than the terms of the plea agreement itself, Defendant was not "induced by

promises or threats" to enter the agreement.  *Id*. at PageID.1025.[31]  In short,

Defendant's waiver of the right to bring a collateral attack, other than based on a

claim of ineffective assistance of counsel, was knowing and voluntary.

### 2.    *Barred Claims Not Premised on Ineffective Assistance of Counsel*

Applying the well-established principles set forth above, the following

claims are barred: (1) by the collateral attack waiver in the plea agreement ("plea

agreement waiver"); (2) because Defendant entered a plea of guilty ("guilty plea

limitation"); (3) because of procedural default;[32] and/or (4) because the claims are

not cognizable under § 2255.  Many of the claims are barred for multiple reasons.[33]

---

[31]  Specifically, during the August 28, 2024 change of plea hearing, the court asked Defendant whether "anyone made any promise or assurance to you of any kind . . . in an effort to get you to enter a plea of guilty other than what's in the plea agreement itself?"  She answered "No."  The court then asked Defendant, "Has anyone threatened you or anyone else, or forced you in any way to plead guilty?"  Again, Defendant answered "No."  And finally, the court asked if Defendant was "pleading guilty of your own free will because you are guilty?"  Defendant responded:  "Yes."  ECF No. 114 at PageID.1028–1029.  And to the extent Defendant claims that the plea was otherwise "coercive," ECF No. 124 at PageID.1313, these under-oath statements at the change of plea hearing fully undermine this claim.

[32]  For each claim subject to procedural default, Defendant has failed to show cause and actual prejudice.  Likewise, she has not demonstrated actual innocence.

(continued . . )

(1)  Prosecutorial misconduct claims relating to events that predate Defendant's plea of guilty: (a) the suppression of emails from loan originators; (b) a threat to prosecute Defendant's mother-in-law; and (c) the AUSA "tendered a plea deal the prohibited ALL downward departures," ECF No. 124 at PageID.1300—these claims are barred by the plea agreement waiver, the guilty plea limitation, and/or procedural default.[34]

(2)  Prosecutorial misconduct claims relating to events that postdate Defendant's plea of guilty: (a) a DOJ investigator posing as a court official and calling a character witness to verify the witness's letter; (b) the AUSA used "forfeited funds to bid at foreclosure auction for personal gain (now under FBI investigation for these misconducts);[35] and (c) the AUSA made false statements at

---

[33]  Many of these claims are also meritless, for the same reasons set forth in the discussion of ineffective assistance of counsel.  Further, many of these claims are conclusory or simply incorrect.  This section of the Order, however, need not address the merits of many of Defendant's barred claims.

[34]  A valid § 2255 waiver covers pre-plea claims of prosecutorial misconduct.  *See United States v. Lee*, 2017 WL 411205, at *2, 4 (D. Haw. Jan. 30, 2017); *United States v. Demasi*, 2025 WL 2051601, at *3 (6th Cir. July 22, 2025); *United States v. Davis*, 2016 WL 6471012, at *12 (D. Idaho Nov. 1, 2016); *United States v. Porter*, 2022 WL 17852017, at *8–9 (W.D. Penn. Dec. 22, 2022).

[35]  Defendant has presented no evidence that the AUSA was involved in bidding at a foreclosure auction on Defendant's previous residence.  Instead, she claims that "DOJ agents were present and actively bidding" on the home.  ECF No. 124 at PageID.1329.  Christopher Mazzei's § 2255 Motion makes the same argument and relies on a letter from Jeremy Engle addressed to President Trump containing double hearsay: "the bidder notified me that government agents were present" and bidding at the auction.  ECF No. 123 at PageID.1273.  Regardless, Defendant has not alleged that the government was involved in the wrongful foreclosure of her house, so she could show no prejudice.

49

the sentencing hearing," *id.*—these claims are barred by the plea agreement waiver and/or procedural default.

(3)  Claims of error in relation to the imposition of restitution and forfeiture:  Defendant suggests that the court erred in ordering both restitution and forfeiture, *id.* at PageID.1313—a § 2255 motion cannot be used as a vehicle to collaterally attack a restitution or forfeiture order, and, in any event, would be barred by the plea agreement waiver and/or procedural default.

(4)  Claim that Defendant's sentence was too harsh:  Defendant claims that although the court recognized her early restitution payments, the court nonetheless "felt the need to sentence [Defendant] harshly," and the Trump administration has stated that most PPP cases should "be handled civilly, not criminally" *id.* at PageID.1314—this claim is barred by the plea agreement waiver and/or procedural default.

\*      \*      \*

In sum, Defendant has failed to show that she is entitled to any relief, whether viewing her claims individually or in total.  Further, no evidentiary hearing is necessary as the issues raised can be conclusively decided based on the evidence in the record.

## V.  CERTIFICATE OF APPEALABILITY

In denying the § 2255 Motion, the court must also address whether Defendant should be granted a certificate of appealability ("COA").  *See* R. 11(a) Governing § 2255 Proceedings in the U.S. Dist. Cts. (providing that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant").  A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

"The standard for a certificate of appealability is lenient."  *Hayward v. Marshall*, 603 F.3d 546, 553 (9th Cir. 2010) (en banc), *overruled on other grounds by Swarthout v. Cooke*, 562 U.S. 216 (2011).  The petitioner is required to demonstrate only "that reasonable jurists could debate the district court's resolution or that the issues are adequate to deserve encouragement to proceed further."  *Id.* (internal quotation marks and citation omitted); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (holding that a certificate of appealability should issue only if a prisoner shows, among other things, "that jurists of reason would find it debatable whether the district court was correct in its procedural ruling").  The standard "requires something more than the absence of frivolity, but something less than a merits determination."  *Hayward*, 603 F.3d at 553 (citation and internal quotation marks omitted).

51

The court carefully reviewed Defendant's assertions and gave her every benefit by liberally construing them.  Based on the above analysis and considering all the allegations in the § 2255 Motion and the reply, the court finds that reasonable jurists could not find the court's rulings debatable.  Accordingly, a COA is DENIED.

## VI.  CONCLUSION

For the foregoing reasons, the court DENIES Defendant's § 2255 Motion and DENIES a Certificate of Appealability.  The Clerk of Court is directed to close the civil case file, Civ. No. 26-00026 JMS-KJM.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, May 1, 2026.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge